In re Ira ALTCHEK, Debtor.

Iris ALTCHEK, Plaintiff,

v.

Ira ALTCHEK, Defendant.

**Bankruptcy No. 90 B 20462.
No. 91 ADV 6004A.**

United States Bankruptcy Court,
S.D. New York.

March 4, 1991.

Shatz, Meier & Scher by Steven K. Meier, New York City, for debtor/defendant.

Office of Jeffrey L. Sapir by Jeffrey L. Sapir, Hartsdale, N.Y., for plaintiff.

DECISION ON MOTION FOR SANCTIONS FOR VIOLATION OF THE AUTOMATIC STAY AND ON COMPLAINT FOR A DETERMINATION OF THE DISCHARGEABILITY OF A DEBT PURSUANT TO 11 U.S.C. 523(a)(5)(B)

HOWARD SCHWARTZBERG,
Bankruptcy Judge.

The debtor, Ira Altchek, filed an Order to Show Cause with this court on or about February 5, 1991 seeking sanctions for the actions of his former spouse, Iris B. DiGennaro, which he alleges violate the automatic stay afforded him by 11 U.S.C. § 362. The actions of Ms. DiGennaro include filing, on January 2, 1991, an Order to Show Cause with the Supreme Court of Westchester County seeking an adjudication of contempt against the debtor for alleged violations of a Stipulation of Settlement entered into between the parties on November 16, 1989 in connection with a Judgment of Divorce. In addition, an Income Execution for Support Enforcement CPLR § 5241 was mailed to the debtor by Ms.

DiGennaro which seeks to deduct from the debtor's earnings arrears alleged due for obligations incurred by the debtor under the November 16, 1989 Stipulation of Settlement.

Ms. DiGennaro has filed with this court an adversary proceeding in which she seeks a determination that an obligation of the debtor is non-dischargeable pursuant to 11 U.S.C. § 523(a)(5)(B). This obligation consists of principal and interest payments on a home equity loan from Barclay's Bank which is secured by a second mortgage on the marital residence and which was assumed by the debtor in the November 16, 1989 Stipulation of Settlement.

*Findings of Fact*

1. On or about May 25, 1990, the debtor filed a Chapter 11 petition with this court. The debtor continues to operate as a debtor-in-possession in accordance with 11 U.S.C. §§ 1107 and 1108.

2. Although the debtor filed his petition for reorganization over 8 months ago, he has not yet filed a disclosure statement or plan of reorganization.

3. The debtor and his former spouse, Iris B. DiGennaro were granted a Judgment of Divorce by the Honorable W. Denis Donovan of the Supreme Court of Westchester County on April 10, 1990. The Judgment of Divorce incorporated a Stipulation of Settlement made in open court on November 16, 1989 (the "Settlement").

4. The Settlement, as incorporated in the Judgment of Divorce provides as follows:

ORDERED AND ADJUDGED, that in open court on November 16, 1989 the parties entered into an oral Stipulation of Settlement spread on the record (the "Stipulation"), a copy of which is attached to, which Stipulation shall be incorporated in this judgment by reference, shall survive and shall not merge in this judgment, and the parties hereby are directed to comply with every legally enforceable term and provisions of such Stipulation as if such term or provision were set forth in its entirety herein, and

the court retains jurisdiction of the matter for the purpose of specifically enforcing such of the provisions of the Stipulation as are capable of specific enforcement, to the extent permitted by law, and of making such further judgment with respect to maintenance, support, custody or visitation as it finds appropriate under the circumstances existing at the time application for that purpose is made to it, or both; and it is further

ORDERED AND ADJUDGED, pursuant to the Stipulation, that the plaintiff shall have sole custody of the children of the marriage, namely, Jillian Altchek, born October 25, 1972 and Joshua Kenneth Altchek, born June 23, 1975 (the "Children"). The Children shall reside primarily with the plaintiff with liberal visitation to defendant; and it is further

ORDERED AND ADJUDGED, pursuant to the Stipulation, that the marital residence, located at 3 Beaver Dam Road, Pomona, New York (the "Pomona property"), shall be the sole and exclusive property of the plaintiff free and clear of any claim of the defendant; and it is further

ORDERED AND ADJUDGED, pursuant to the Stipulation, that the plaintiff shall be solely responsible for the payment of the first mortgage, held by Dime Savings Bank; on the marital residence, in the approximate amount of $45,000; and it is further

ORDERED AND ADJUDGED, pursuant to the stipulation that the defendant shall be solely responsible for the payment of the interest (and all late charges, if any) on the home equity loan held by Barclays Bank on the marital residence, in the approximate amount of $228,000 and defendant shall be solely responsible for paying off the entire principal of said loan upon the earlier to occur of:

(a) the youngest child, Joshua, graduating from high school or (b) the defendant closing on the sale of his office building and property, located at 65 South, Route 303, Blauvelt, New York (the "Blauvelt property"); and it is further

ORDERED AND ADJUDGED, based upon the Stipulation, that in order to secure the debtor's payment of the interest (and all late charges, if any) on the home equity loan held by Barclays Bank on the Pomona property and to secure his payment of the principal of said loan as provided in this judgment, the defendant shall sign a second mortgage in favor of the plaintiff on the Blauvelt property within 10 days of delivery of such mortgage to defendant's attorneys. Said second mortgage shall be in the sum of $228,000 plus interest from the date hereof at the same rate of interest as required to be paid to the Barclay's Bank on the home equity loan. In the event that the defendant fails to execute such second mortgage as provided herein, the Sheriff's Office shall execute such second mortgage. The defendant shall have the right to refinance the existing mortgage on the Blauvelt property. Should the lending institution require the removal of the plaintiff's second mortgage as a lien against the Blauvelt property, the defendant shall have the right to provide substitute security for the defendant's obligations hereunder regarding the home equity loan. Such substitute must be acceptable to the plaintiff, so that the plaintiff's right to assure the defendant's compliance with his obligations shall not be diminished. In the event the defendant fails to comply with his obligations to make payment of the interest and any late charges on the Barclay's Bank home equity loan and such failure causes foreclosure to be threatened on the Pomona property, the plaintiff shall have the right to immediately cause the sale of the Blauvelt property to enforce payment of her second mortgage, or, if there is substitute collateral, to immediately apply such collateral or the proceeds thereof, to the payment of all sums due on the home equity loan including principal, interest, late charges, penalties and counsel fees. Further, in the event the defendant fails to make full payment of the balance outstanding on the Barclay's home equity loan when due as provided herein, the plaintiff shall have the same rights to secure said payment as provid-

ed in the preceding sentence; and it is further

ORDERED AND ADJUDGED, pursuant to Stipulation, that so long as the defendant is obligated to contribute to the Children's support as provided in the Stipulation, he shall maintain and keep in full force and effect a policy or policies of life insurance on his life, in an amount not less than which is sufficient to insure defendant's actuarial financial obligation to the Children, naming the Children as irrevocable beneficiaries thereof, and the defendant shall irrevocably designate the plaintiff as trustee for the benefit of each Child; and it is further

ORDERED AND ADJUDGED, that plaintiff is authorized to resume the use of her maiden name or other former surname, to wit, Kleiman; and it is further

ORDERED AND ADJUDGED, that the County Clerk is hereby directed to enter Judgment of Divorce forthwith.

5. In addition to the major terms of the Stipulation which were formally set forth in the Judgment of Divorce, relevant portions of the Stipulation, as reflected in the court transcript, dated November 16, 1989 are set forth as follows:

* * * * * *

... the home equity loan currently in the approximate amount of $228,000.00 will be assumed by Mr. Altchek ...

* * * * * *

Each of the parties have interests in, have interest in an investment called "Motor Age East," and they will maintain their interests as those interests now exist.

* * * * * *

Now, there are certain custodial funds and accounts, and an Altchek family trust that contain (sic) funds that belong to the children. All of those accounts and assets and funds will be turned over to Mrs. Altchek as custodial parent; and all of the income and profits derived from any of those assets will be placed into those custodial accounts that will be controlled by Mrs. Altchek for the benefit of the children. Those funds will be used for the children's education; for the children's college; for certain other items such as unreimbursed medical expenses, camp expenses, tutorial expenses and whatever other expenses both parties agree to.

* * * * * *

Ms. Ellenbogen: When he says, "that account," we're referring to the current accounts, one in—two in Shearson, one for the benefit of Jillian, and one for the benefit of Joshua.

In addition, we're referring to the Altchek family trust, which is made up of assets and receipts to be expected from a company called Coska Nyack, 65 South Associates, one-third of that company, and anything that comes from PAL that was assigned there. We're also referring to the children's interest in Motor Age Associates, (sic) and Mr. Altchek will cooperate in reissuing the stock certificates in that company, with Iris Altchek as the custodian for each of the children.

Mr. Dobrish: It isn't a corporation, it's a partnership, and the partnership interests, I'm advised are currently in the name of Mr. Altchek as custodian for the children. The partnership interest will be changed over to Mrs. Altchek as custodian for the children.

* * * * * *

Mr. Dobrish: Mrs. Altchek is waiving her right to maintenance; and Mr. Altchek is waiving his right to maintenance.

Mr. Altchek will pay $2,000.00 a month to Mrs. Altchek as and for child support commencing December 1, and continuing until Josh's graduation from college or his 22nd birthday, whichever occurs sooner.

* * * * * *

Mr. Dobrish: It is understood that the temporary support order, the pendente lite order will terminate as of today, and that both parties agree that there are no arrears due under that order.

* * * * * *

6. A trust instrument entitled "Altchek Family Education Trust" dated April 1,

1987 was set up for the benefit of the Altchek children. This instrument conveyed the following property to the children:

a. Limited Partnership Interest—3¾% PAL Associates

b. General Partnership Interest—⅓ 65 South Associates

c. 16.65 shares of Coska Nyack Development Corp.

7. On or about June 27, 1990, Ms. DiGennaro filed a Motion for Relief from the Automatic Stay (the "Automatic Stay Motion"). A hearing on the Automatic Stay Motion was held before this court on or about July 9, 1990 wherein this court modified the automatic stay to allow Ms. DiGennaro to proceed on matters which were not barred by the automatic stay.

8. Thereafter, on January 29, 1991, Ms. DiGennaro filed an Order to Show Cause with the Supreme Court of Westchester County (the "January 29, 1991 Order to Show Cause") which sought the entry of an order for contempt:

(1) adjudging the Defendant to be in contempt of Court for his willful and deliberate failure to comply with the orders of this Court and the provisions of the Judgment of Divorce granted in this action on the 10th day of April, 1990 and entered in the office of the Westchester County Clerk on the 11th day of April, 1990, in that he is in default by virtue of the following:

(a) he has failed and refuses to make the payments of the monthly interest and late charges on the home equity loan held by Barclay's Bank on the prior marital residence for the months of October, November and December 1990 and January 1991.

(b) his removal of funds from the Children's Education Trust without authorization and in direct disregard of the order of this Court not to touch the children's accounts,

(c) by his failure to deposit a dividend check paid to the Children's Education Trust into the Trust account,

(d) by his failure to inform the Court or the Plaintiff that the mortgage he was to execute in favor of the Plaintiff on his Blauvelt property to secure his payments on the home equity loan would be ineffectual as he already knew of a prior action and decision of the Rockland County Supreme Court that would become a lien against such property,

(e) by his failure and refusal to execute said mortgage.

(2) upon such a finding of contempt, committing and incarcerating Defendant in the County Jail pursuant to Judiciary Law, Section 776; and

(3) continue the restraining order on Tina Hertzoff, granted by the Hon. W. Denis Donovan in an Order to Show Cause, dated May 11, 1990, which restraining (sic) that individual from disposing of, assigning, transferring, encumbering or hypothecating property located at 474 Neptune Walk, Seaview, Fire Island, New York, constructively held for Defendant,

(4) granting such other, further and different relief as this Court may seem just, proper and equitable.

9. In addition, Ms. DiGennaro mailed an Income Execution for Support Enforcement CPLR § 5241 (the "Income Execution") to the debtor at the address listed on the debtor's Chapter 11 petition. The Income Execution stated that the nature of the default was that "[t]he debtor has failed to pay the monthly interest on a home equity loan on the marital residence for the months of October, November and December, 1990, which represents additional child support pursuant to a stipulation of settlement and Judgment of Divorce."

10. A home equity loan was obtained from Barclays Bank by the debtor and his former spouse in April, 1987. The initial sum of $125,000 was withdrawn by the parties at closing and was used by the debtor to purchase 3 shares of a limited partnership, Motor Age East Associates. Two shares of Motor Age East Associates are owned by the debtor with one share being given to the Altchek children and held in their trust account. The debtor is the general partner of Motor Age East Associates.

11. The remainder of the $228,000 line of credit, approximately $103,000, was withdrawn by the debtor after separation from his former spouse.

12. Thereafter, on February 5, 1991, the debtor submitted an Order to Show Cause (the "February 5, 1991 Order to Show Cause") to this court requesting sanctions, an order for contempt and an order enjoining Ms. DiGennaro from proceeding with the January 29, 1991 Order to Show Cause. The February 5, 1991 Order to Show Cause was signed, but allowed Ms. DiGennaro to continue with the January 29, 1991 Order to Show Cause to the extent of any criminal contempt which may arise from the acts alleged in Ms. DiGennaro's affidavit, which accompanied the January 29, 1991 Order to Show Cause.

13. A hearing, on the February 5, 1991 Order to Show Cause, was held in this court on February 13, 1991.

14. On or about January 4, 1991, Ms. DiGennaro filed with this court a Complaint seeking a determination that certain obligations contained in the Stipulation and Judgment of Divorce are debts which are nondischargeable pursuant to 11 U.S.C. § 523(a)(5) (the "Dischargeability Complaint").

15. The debtor's Answer to the Dischargeability Complaint (the "Answer"), filed on or about February 11, 1991, contains a counterclaim which asserts that the debtor's former spouse is obligated to indemnify him for certain obligations arising from an entity entitled the Gardenia Organization. A separate adversary complaint has been instituted by the debtor relating to these obligations.

16. A trial on the Dischargeability Complaint was held before this court on February 21, 1991 (the "February 21 trial").

17. At the February 21 trial, a pendente lite order issued by Judge Donovan on June 1, 1988 (the "pendente lite order") was introduced into evidence. Although the pendente lite order was superceded by the Stipulation and Judgment of Divorce, its contents are relevant to certain issues in the case. The relevant portions of the pendente lite order are as follows:

\* \* \* \* \* \*

"The criteria established with respect to the temporary maintenance of a spouse and children have been considered (Section 236, Part B, subd. 6, par. a (7), Domestic Relations Law). However, the primary concern of the court when dealing with pendente lite applications is to fix a reasonable maintenance award which allow a spouse and children to subsist pending trial of the action. Therefore, the court's attention has focused upon the needs, finances and the circumstances of the respect parties.

The parties were married in 1967 and have two children, ages 15 and 12 who currently reside with plaintiff wife in the marital residence. She is a multi-degreed more recent attorney engaged in part-time divorce mediation exclusively and the 1986 tax return she submits shows $22,000 gross per year but a "loss" after expenses and depreciation resulting in "zero" income; otherwise she claims, without ever specifying, a low income not even capable of meeting her own essential life expenses.

Defendant husband is a certified public accountant devoting substantial time to real estate development and investment. The same 1986 return shows $300,000 gross income and about $220,000 net income. He claims, however, that 1986 was a most unusual year income-wise, containing income items actually unavailable and many "one-time" sums. His truer income, he says, is in line with his estimate of his 1988 net income, i.e. in the areas of $112,000.

\* \* \* \* \* \*

Keeping in mind the necessary circumstances and aims of pendente lite relief, a review of plaintiff's net worth statement in realistic terms results in a finding of $5,600 as reasonable and necessary monthly expenses inclusive of first mortgage and other expenses on the marital residence which shall remain plaintiff's responsibility.

\* \* \* \* \* \*

Defendant shall pay over to plaintiff the monthly sum of $4,600 allocated at $3,000

as maintenance and $1,500 as child support with plaintiff being responsible for first mortgage and other expenses of the marital home, all retroactive to November 1st, 1987 and any arrears calculated after credit for payments actually made will be discharged at an additional $1,000 per month.

18. The former spouse's matrimonial attorney, Joan Ellenbogen, testified that she took part in the negotiations of the Settlement. Ms. Ellenbogen testified that the Barclays home equity loan was in dispute because a large part of the funds were drawn upon after the debtor separated from his former spouse.

19. Ms. Ellenbogen also testified that there was a need to have more child support than Mr. Altchek was willing to pay. Furthermore, Ms. Ellenbogen testified that the agreement reached in the Stipulation regarding the Barclay home equity loan was a kind of child support and that the thrust of the agreement was to keep the family in the home.

20. The debtor testified that the purpose of his assumption of the home equity loan payments was to allow his children to stay in the marital residence.

21. The debtor testified that the funds he withdrew from the Barclay Home Equity Loan were used for real estate investments, but did not present any documentary evidence which would prove this assertion.

## DISCUSSION

### DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(5)(B)

■ The first issue to be decided in this case is whether a home equity loan held by Barclays Bank on the marital residence located at 3 Beaver Dam Road, Pomona, New York (the "marital residence"), in the approximate amount of $228,000 is a nondischargeable debt pursuant to 11 U.S.C. § 523(a)(5)(B). As set forth in 11 U.S.C. § 523(a)(5)(B),

(a) discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support.

Whether or not a debt is a support obligation or part of a property settlement is a question of federal bankruptcy law and not state law. *Long v. West (In re Long)*, 794 F.2d 928, 930 (4th Cir.1986); *Shaver v. Shaver*, 736 F.2d 1314 (9th Cir.1984); *Long v. Calhoun (In re Calhoun)*, 715 F.2d 1103 (6th Cir.1983); *Williams v. Williams (In re Williams)*, 703 F.2d 1055 (8th Cir.1983); *Pauley v. Spong (In re Spong)*, 661 F.2d 6 (2d Cir.1983); *In re Bedingfield*, 42 B.R. 641 (S.D.Ga.1983). There is no federal law of domestic relations. *DeSylva v. Ballentine*, 351 U.S. 570, 580, 76 S.Ct. 974, 980, 100 L.Ed. 1415 (1956). The complaining spouse has the burden of establishing that an obligation is nondischargeable on the ground that it is actually in the nature of alimony, maintenance or support, because the concept of dischargeability under 11 U.S.C. § 523 must begin with the assumption that dischargeability is favored under the Bankruptcy Code. *Tilley v. Jessee*, 789 F.2d 1074, 1077 (4th Cir.1986); *Long v. Calhoun*, 715 F.2d at 1111.

■ The seminal case dealing with this issue is found in *Long v. Calhoun (In re Calhoun)*, 715 F.2d 1103 (6th Cir.1983), which sets forth a two-prong test each consisting of several factors for a court to consider in making a determination of the dischargeability of certain obligations arising from separation agreements. The first factor to consider is whether the state court or the parties intended to create an obligation to provide support through the assumption of joint debts. *Long v. Cal-*

*houn (In re Calhoun),* 715 at 1109. In making such an inquiry, the bankruptcy court may consider relevant evidence such as the

> nature of the obligations assumed (provision of daily necessities indicates support); the structure and language of the parties' agreement or the court's decree; whether other lump sum or periodic payments were also provided; length of the marriage; the existence of children from marriage; relative earning powers of the parties; age, health and work skills of the parties; the adequacy of support absent the debt assumption; and evidence of negotiation or other understandings as to the intended purpose of the assumption.

*In re Calhoun,* 715 at 1108 n. 7.

If the bankruptcy court finds that there was intent by the state court or the parties to create an obligation of support, then the bankruptcy court should apply the second prong of the *Calhoun* test. This next inquiry is "whether such assumption has the effect of providing the support necessary to ensure that the daily needs of the former spouse and any children of the marriage are satisfied." *In re Calhoun,* 715 at 1109.

In applying the two-prong analysis of *Calhoun* to this case, this court must first look to the intent of the parties to create an obligation of support through the assumption of the Barclay Home Equity Loan.

The Stipulation, unlike most Separation Agreements is not divided into separate headings such as Visitation, Custody, Property Division and Alimony and Maintenance. Therefore, this court is not bound by such classifications, but must look to all of the circumstances to determine the intent of the parties regarding the Barclay obligation.

It is undisputed that it was the intent of the parties, both the debtor and his former spouse, in drafting the Stipulation that the children be allowed to remain in the marital home. It is also undisputed that the debtor's former spouse is responsible for the payment of the first mortgage on the home in the amount of $422.91 per month. Fur-

thermore, at the time of the divorce the former spouse was making approximately $22,000.00, with the debtor making at least $112,000 per year, if not more. Additionally, Ms. DiGennaro's matrimonial attorney, Ms. Ellenbogen testified that there were on-going negotiations regarding the Barclay Home Equity Loan and also, the amount which the debtor was willing to pay as child support. Ms. Ellenbogen testified that the assumption, by the debtor, of the payment of the Barclay Home Equity Loan was a supplement to the inadequately low, direct support payment the debtor was willing to pay. These factors support a determination that the $228,000 Barclay obligation assumed by the debtor under the Stipulation is an obligation which is in the nature of maintenance and support.

Another factor which indicates that the obligation to repay the Barclay loan is in the nature of support, rather than a property settlement, is the language and amount of support and maintenance awarded the debtor's former spouse in the pendente lite order issued by the state court. The state court determined that the debtor was to pay $4,600 per month, $3,000 as maintenance and $1,500 as child support. Ms. DiGennaro testified at the February 21, 1991 trial, that the debtor had been delinquent in paying obligations to her prior to the final Judgment of Divorce. She further testified that she attempted to secure his timely payments and ensure that the children would be able to remain in the marital home by structuring a portion of the maintenance and support payments in such a way that she could have some assurance of payment. In fact, the $4,200 current monthly obligation of the debtor under the Stipulation, $2,200 for the monthly payment to Barclays and $2,000 as direct, child support is very close to the $4,600 maintenance and support obligation found by the state court to be a sum necessary for support of the debtor's former wife and children.

Having found that there was intent by the parties to create an obligation for support, this court must next apply the second prong of the *Calhoun* test, namely, wheth-

er the assumption of the Barclay loan has the effect of providing the support necessary for the daily needs of the debtor's former wife and children.

One of the most basic needs of a former spouse and children is a home. The debtor argued at trial that the spouse could sell the home and move into an apartment for $300 per month. It is certainly conceivable that the debtor's spouse could be reduced to that level. However, the debtor's income at the time of the divorce was quite substantial, with his 1986 income tax returns showing a gross income of $300,000 and a net income of $220,000, while the debtor's former spouse, in 1986, made $22,-000 in gross income, with a zero income after expenses and depreciation. Although the debtor asserts that his income has been significantly lower in recent years, $112,-000 in 1988 and $75,000 in 1989, this court does not have documentary evidence which reflects more current figures of the debtor's income over the last several years because he has failed to file income tax returns.

In addition, it is the debtor who drew on the Barclay home equity line of credit substantial sums of money, after his separation from his former spouse, which sums have not been accounted for by the debtor. It is these actions by the debtor that put the home of his children in jeopardy. These payments of $2,200 per month are substantial and without them the former spouse and children are going to be deprived of a basic need, their home, through a foreclosure by Barclay's Bank for failure to make the payments on the home equity line of credit. In fact, as of December 31, 1990, the payment due on the home equity line of credit was $8,940.00.

The obligation of the debtor meets both prongs of the *Calhoun* test in that there was an intent by the parties to create an obligation to provide support through the assumption of the Barclays obligation and the assumption of the obligation has the effect of providing the support necessary to ensure that the daily needs of the former spouse and children for housing are met. As a result, the obligation to pay the $228,000 on the Barclays Home Equity Loan is in the nature of maintenance and support and is non-dischargeable pursuant to 11 U.S.C. § 523(a)(5)(B).

The debtor sets forth in his brief filed in connection with this adversary proceeding, that this court's decision in the case of *In re Freyer*, 71 B.R. 912 (Bankr.S.D.N.Y. 1987), is on point with his case. However, in the *Freyer* case, one of the decisive factors in this court's determination turned on the fact that the separation agreement did not contain an assumption of the $45,-000.00 owed to the debtor's credit union. The debtor and his former wife remained jointly liable for the obligation. Furthermore, the separation agreement provided that if the marital residence was sold, the debtor was entitled to receive $45,000.00 from the net proceeds of the sale, which he agreed to apply to paying in full the $45,-000.00 debt.

In this case, the debtor specifically assumed the full $228,000.00 debt, as evidenced by the transcript of the in-court Stipulation. In addition, the debtor was to execute a second mortgage in favor of his former spouse on other property, the Blauvelt property, owned by the debtor in order to secure the $228,000.00 debt. There were also detailed provisions contained within the Stipulation which provided for execution of the second mortgage on the Blauvelt property, refinancing of the existing mortgage on the Blauvelt property, substitution of security, and foreclosure on the Blauvelt property in the event the debtor's former spouse was threatened with foreclosure on the home as a result of the debtor's failure to make payments on the Barclay's obligation.

These well structured, detailed provisions are evidence of the intent of the parties to ensure that other property be indirectly substituted for the marital residence as security for the Barclay second mortgage. The attempts to unencumber the marital residence reflect an intent to ensure that the second mortgage, and its high monthly payment, would not interfere with the ability of the debtor's children to remain in the marital residence. As testi-

fied by the parties at trial, the debtor and his former spouse promised their youngest son that they would maintain some stability in his life, by at least allowing him to remain in his current home. These factors distinguish the *Freyer* case and demonstrate that the assumption of the Barclay obligation by the debtor was in the nature of maintenance and support because instead of simply assuming a marital debt as part of a property settlement, the debtor, in this case, assumed an obligation to pay a high monthly mortgage which he placed on the marital home. Absent his assumption of the mortgage, his children would not be able to remain in the marital home because his former spouse is unable to make the payments of approximately, $2,200 per month.

The debtor set forth a counterclaim in his Answer to the Complaint. The counterclaim asserts that any funds due the debtor's former spouse should be offset by the funds due from Ms. DiGennaro as indemnification for certain obligations arising from ownership in an organization referred to as the Gardenia Organization. However, the debtor did not introduce any evidence at the February 21 trial which supports his counterclaim. Furthermore, there is currently an adversary proceeding pending before this court which was filed by the debtor and which seeks essentially the same relief. As a result, this court will adjudicate these indemnity issues when evidence is properly brought before this court at the trial on the adversary proceeding.

## DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY INCOME EXECUTION

 This case brings into focus one of the difficulties inherent in the administration of a Chapter 11 case in which the debtor is a sole proprietor, namely, to what extent post-petition earnings constitute property of the estate. A Chapter 11 sole proprietorship case is a hybrid proceeding consisting of characteristics of both a Chapter 13 and Chapter 11 case. The usual Chapter 11 reorganization involves a corporation which continues to employee individuals, including officers, who are paid a set salary for performing beneficial duties for the corporation. The management and officers of the corporation continue to operate its business as a debtor-in-possession after the filing of the Chapter 11 petition. As a debtor-in-possession, the corporation may enter into contracts, collect accounts receivable and rents, and generally continue to operate its business much the same as it did prior to filing the petition. The Chapter 11 debtor uses the profits realized from its continued operation to fund a plan of reorganization with the employees continuing to receive their set salaries.

A Chapter 13 debtor engaged in business, may also continue to operate his or her business in accordance with 11 U.S.C. § 1304. However, the legislature has chosen to create an exception to the portion of 11 U.S.C. § 541(a)(6) [1] which excludes from property of the estate "earnings from services performed by an individual debtor after the commencement of the case." The exception is contained in 11 U.S.C. § 1306(a)(2) which provides as follows:

§ 1306. Property of the estate.

(a) Property of the estate includes, in addition to the property specified in section 541 of this title—

(2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under Chapter 7, 11 or 12 of this title, whichever occurs first.

Case law on this issue is limited, with those courts which have addressed this issue differing on the results. In *In re Fitzsimmons*, 725 F.2d 1208 (9th Cir.1984), the

---

1. 11 U.S.C. § 541(a)(6) provides as follows:
 (a) The commencement of a case section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

 (6) Proceeds, product, offspring, rents, and or profit of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

9th Circuit, held that 11 U.S.C. § 541(a)(6) excluded all earnings generated by services "personally" performed by an individual debtor from property of the estate. *In re Fitzsimmons*, 725 F.2d at 1211.

The *Fitzsimmons* court distinguished the personal services of the debtor from accounts receivable, good will, employment contracts with the firms staff and invested capital. *In re Fitzsimmons*, 725 F.2d at 1211. In distinguishing the debtor's personal services, the court observed that creditors of a sole proprietorship are entitled to enjoy in the profits of the sole proprietorship, just as they are burdened with the losses of the proprietorship. *Id.* at 1211. In strictly construing the language of 11 U.S.C. § 541(a)(6), the *Fitzsimmons* court reasoned that in accordance with that section, the earnings generated by the individual debtor, "personally", post-petition, are not property of the estate, while other assets of the sole proprietorship, such as rents, employment contracts with the firm's staff and accounts receivable are property of the estate. *Id.* The *Fitzsimmons* court then remanded the case to the Bankruptcy Court for a determination of the portions of the debtor's law practice which were attributable to his personal efforts with that amount to be excluded from the bankruptcy estate. *Id.* at 1212.

Another court, *In re Cooley*, 87 B.R. 432 (Bankr.S.D.Tex.1988), criticized the *Fitzsimmons* court's engrafting of the term "personally" into § 541(a)(6) as "statutorily unpersuasive" and "unfaithful" to the directive of that section. *Id.* at 439. In its interpretation of § 541(a)(6), the *Cooley* court placed the burden of proof upon the creditor to show that an individual debtor's earnings were proceeds, product, rents or profits derived from assets or other property interests which had previously accrued to the estate pursuant to 11 U.S.C. § 541. *Id.* at 441. The court observed that this interpretation of 11 U.S.C. § 541(a)(6) furthered the policies of advancing the debtor's fresh start and preventing a potential conflict with the prohibition on involuntary servitude as proscribed under the Thirteenth Amendment. *Id.* at 440.

Finally, in a recent case, *In re Herberman*, 122 B.R. 273 (Bankr.W.D.Tex.1990), decided in October, 1990, yet another rationale, with a different holding was advanced. The *Herberman* court utilized what it termed a "backout" exception for personal service earnings, which interpreted section 541(a)(6) to establish that earnings excepted from property of the estate be earnings *from* property of the estate. (emphasis added). Thus, under the *Herberman* rationale, "[e]arnings from services which are not proceeds, etc. of or from property of the estate in the first place are not governed by the exception clause in subsection (a)(6)." Instead, the *Herberman* court combined the language of 11 U.S.C. § 541(a)(7) and the principles of a Chapter 11 debtor-in-possession in its determination that all post-petition earnings are property of the estate and that the individual sole proprietor may be paid a "salary" for the services performed on behalf of the estate for his or her services as an employee of the estate.

Although this court recognizes the distinct differences in treatment of sole proprietors under Chapter 11 and Chapter 13, it is bound to uphold the laws as set forth in the Bankruptcy Code. Therefore, unless or until the legislature chooses to enact an exception for a Chapter 11 sole proprietor to the language contained in 11 U.S.C. 541(a)(6), this court must adhere to the language of the Bankruptcy Code as it is written.

In essence, an interpretation of 11 U.S.C. § 541(a)(6) in the context of a Chapter 11 sole proprietorship serves to divide the debtor into two entities: the debtor, as an individual who receives earnings for services he or she performs after the commencement of the case and the debtor, as a sole proprietor who continues the sole proprietorship and receives proceeds, offspring, products, rents and profits. Those earning which the debtor receives for services performed are excluded from the Chapter 11 estate by 11 U.S.C. § 541(a)(6). However, property of the Chapter 11 estate includes, under 11 U.S.C. § 541(a)(1), "all legal and equitable interests of the debtor in proper-

ty as of the commencement of the case", as well as "proceeds, product, offspring, rents, and or profits of or from property of the estate ..." as set forth in 11 U.S.C. § 541(a)(6). Thus, a Chapter 11 sole proprietor estate includes all pre-petition property of the debtor, both individually and as a sole proprietor, plus proceeds and profits from the property which come to fruition post-petition, with the only exclusion being post-petition earnings of the debtor acquired as a result of his or her services.

This interpretation advances the fresh start approach inherent in bankruptcy law. It also prevents any conflict with the Thirteenth Amendment's prohibition against involuntary servitude.

From a creditor's perspective, this interpretation of 11 U.S.C. § 541(a)(6) is not necessarily a prohibition against receiving fair treatment in the Chapter 11 reorganization, although, it might appear to reduce the proceeds available to pay out under the plan. A creditor has several weapons provided by the Bankruptcy Code with which to monitor the Chapter 11 sole proprietor. First, the creditors may seek to have their debt determined to be nondischargeable under 11 U.S.C. § 523, in which case a successful adjudication will allow the creditor to proceed with its nondischargeable claim against the debtor's post-petition earnings. The creditor may also refuse to accept the plan because of the inadequately low payment under the plan. Such refusal could ultimately result in the debtor being unable to confirm its plan of reorganization because the plan does not meet the confirma-

tion requirements set forth in 11 U.S.C. § 1129.

In addition, a creditor may move to convert the Chapter 11 case to a case under Chapter 7 or dismiss the case pursuant to 11 U.S.C. § 1112.[2] Notably, one of the grounds for conversion or dismissal under 11 U.S.C. § 1112(b)(2) is the inability of the debtor to effectuate a plan. If, as some creditors may argue, without the debtor's earnings for services performed post-petition, there will be almost no funds with which to finance the plan of reorganization, a creditor may move for conversion or dismissal. If the case is converted, then the debtor's prepetition property, which may include homes, cars, shares in a partnership or corporation and jewelry will be liquidated by the Chapter 7 trustee and paid to the unsecured creditors. In the event the case is dismissed, then the creditor can proceed against the debtor the same as it did prior to the filing of the Chapter 11 petition.

▪ The debtor testified that he owned an interest in a partnership, Motor Age East Associates. He also testified that $360.00 is received each month from the partnership. In accordance, with 11 U.S.C. §§ 541(a)(1) and 541(a)(6), these proceeds are property of the estate and must be deposited into the debtor-in-possession account for use in funding the plan of reorganization. In addition, any other proceeds or profits from the Chapter 11 estate must be deposited in the debtor-in-possession account. However, the earnings received by the debtor, post-petition, for services he performed, individually, are not property of

---

**2.** The grounds for dismissal or conversion under 11 U.S.C. § 1112(b) are the same and include:

 (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;
 (2) inability to effectuate a plan;
 (3) unreasonable delay by the debtor that is prejudicial to creditors;
 (4) failure to propose a plan under section 1121 of this title within any time fixed by the court;
 (5) denial of confirmation of every proposed plan and denial of a request made for additional time for filing another plan or modification of a plan;

 (6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title;
 (7) inability to effectuate substantial consummation of a confirmed plan;
 (8) material default by the debtor with respect to a confirmed plan;
 (9) termination of a plan by reason of the occurrence of a condition specified in the plan; or
 (10) nonpayment of any fees or charges required under chapter 123 of title 28.

the estate and are not subject to the claims of his pre-petition creditors.

Having reached the determination that the debtor's earnings, post-petition, for services he performed, individually, are not property of the estate, this court will address the issues of whether the Income Execution mailed to the debtor, by his former spouse and the filing of the January 29, 1991 Order to Show Cause, were in violation of the automatic stay.

### The Contempt Proceeding

The debtor's cause of action for violation of 11 U.S.C. § 362 consists of two components. First, is an alleged violation of the automatic stay to the extent that the January 29, 1991 Order to Show Cause may affect property of the estate as that phrase is defined under § 541 of the Bankruptcy Code. The other portion deals with the extent to which the Income Execution amounts to the commencement or continuation of a judicial proceeding against the debtor in violation of 11 U.S.C. § 362(a)(1) [3].

■ One of the items of relief sought by the Order to Show Cause is the continuation of a restraining order against a third party, Tina Herzog, the debtor's wife, restraining Ms. Herzog from disposing of, assigning, transferring, encumbering or hypothecating property located at 474 Neptune Walk, Seaview Fire Island, New York (the "Neptune Property").

The debtor's petition is not a joint petition, but is a petition filed only in the debtor's name. Furthermore, the Neptune Property is not listed in the debtor's Schedule of Assets. In fact, the debtor maintains that this is his wife's property which was obtained prior to their marriage. (*See* ¶ 17 of the Affidavit of Steven K. Meier dated February 4, 1991).

The automatic stay is applicable only to the debtor and property of the debtor. Section 362 of the Bankruptcy Code does not protect third parties or their property. *See Credit Alliance Corp. v. Williams*, 851 F.2d 119 (4th Cir.1988) (automatic stay does not protect non-debtor guarantor from creditor's action to enforce default judgment entered on Chapter 11 debtor's note); *Matter of Johns–Manville Corp.*, 26 B.R. 405, 409 (Bankr.S.D.N.Y.1983), *aff'd*, 40 B.R. 219 (S.D.N.Y.1984) (Courts are very clear in holding that the automatic stay set forth in the 11 U.S.C. § 362 relates only to actions against the debtor and does not operate to stay an action against any non-debtor parties.). The only way the Neptune Property could be brought under the protection of 11 U.S.C. § 362 would be through a successful attempt to recover the property as a fraudulent conveyance under 11 U.S.C. § 548. However, there has been no complaint filed with this court to recover property under 11 U.S.C. § 548 and unless or until such a recovery is made for the benefit of the estate, the Neptune Property does not fall within the protection of 11 U.S.C. § 362. Therefore, the relief sought by the January 29, 1991 Order to Show Cause requesting a continuation of the restraining order against the debtor's current spouse does not violate the automatic stay.

■ Two other aspect of relief sought in the January 29, 1991 Order to Show Cause deal with funds from the Altchek Family Education Trust. Specifically, the Order to Show Cause seeks a finding of contempt, by Judge Donovan, due to the debtor's failure to deposit a dividend check paid to the Altchek Family Education Trust into the children's trust account and the debtor's removal of funds from the Altchek

---

**3.** 11 U.S.C. § 362(a)(1) is set forth as follows:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 USC 78eee(a)(3)), operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

Family Education Trust in disregard of Judge Donovan's previous order.

Once again, in order for the moving party to establish a violation of the automatic stay, the debtor must demonstrate that property of the estate is involved. The debtor has not claimed or demonstrated that the Altchek Family Education Trust or the dividend paid on behalf of the fund constitute property of the estate.

The determination of the extent of a debtor's interest in property is controlled by state law. *See Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). The relevant portions of New York law governing trusts begin with New York Estate, Powers & Trusts §§ 7–1.1 and 7–1.2. Section 7–1.1 provides that "[e]very person who by virtue of any disposition is entitled to the actual possession of property and the receipt of income therefrom has a *legal estate* in such property of the same quality and duration and subject to the same conditions as his *beneficial interest.*" (emphasis added) N.Y. Est. Powers & Trusts Law § 7–1.1 (McKinney 1990). Furthermore, Section 7–1.2 [4] clearly establishes that a trustee has neither a legal or equitable interest in the property contained in the trust.

To the extent that the interest in the three partnership properties were a gift to the Altchek children under the Uniform Gift to Minors Act, the interests of the relative parties in the partnership gifts are governed by Article 7, Part 4, of the Estates, Powers and Trusts Law of the State of New York. Section 7–4.2 provides that "[a]n adult may, during his lifetime, make a gift of a security, ... an interest as a limited partner of a limited partnership ... to a person who is a minor on the date of the gift ..." N.Y. Est. Powers & Trusts Law § 7–4.2 (McKinney 1990). The effect of such a gift, as set forth in § 7–4.3(a) [5] is to create an irrevocable gift which conveys to the minor an indefeasibly vested legal title to the security of limited partnership.

These sections of New York Trust Law establish that the legal and equitable interests in the property contained in the Altchek Family Education Trust and any proceeds realized from this property are owned by the Altchek children and not the debtor. Therefore, the children's trust funds do not fall within the definition of property of the estate as set forth in 11 U.S.C. § 541. Since these trust funds are not property of the estate, it follows that there has been no violation of the automatic stay by the filing of the January 29, 1991 Order to Show Cause with respect to the trust funds.

■ Assuming *arguendo* that the debtor somehow retained bare legal title in the property contained in the Altchek Family Education Trust, his interest would remain as only a bare legal title. Any right to proceeds or profits from this property would be excluded from his estate by 11 U.S.C. § 541(d) because he does not hold the equitable interest in the property. *See In re Cohoes Indust. Terminal, Inc.*, 62 B.R. 369 (S.D.N.Y.1986) (In accordance with 11 U.S.C. § 541(d), where a debtor holds bare legal title as of the commencement of the bankruptcy case, without any equitable interest, the property of the bankruptcy estate will consist of bare legal title only, without any equitable interest in the property.)

■ The next item of relief sought by virtue of the January 29, 1991 Order to Show Cause is Ms. DiGennaro's effort to

---

**4.** Section 7–1.2 provides as follows:

Every disposition of property shall be made directly to the person in whom the right to possession and income is intended to be vested and not to another in trust for such person, and if made to any person in trust for another, no estate, legal or equitable, vests in the trustee. But neither this section nor 7–1.1 shall apply to trusts arising or resulting by implication of law. N.Y. Est. Powers & Trusts Law § 7–1.2 (McKinney 1990).

**5.** Section 7–4.3(a) provides as follows:

(a) A gift made in a manner prescribed by this part is irrevocable and conveys to the minor indefeasibly vested legal title to the security ... interest as a limited partner of a limited partnership ... given, but no guardian of the minor shall have any right, power, duty or authority with respect to the custodial property except as provided in this part. N.Y. Est. Powers & Trusts Law § 7–4.3(a) (McKinney 1990).

obtain a finding of contempt before Judge Donovan for the failure of the debtor to inform the Court that the mortgage he was to execute in favor of his ex-wife on his Blauvelt property to secure his payments on the home equity loan would be ineffectual because of a prior action and a decision of the Rockland County Supreme Court that would become a lien against the property.

This relief seeks only an adjudication of contempt and not any affirmative action, such as a judgment against or the filing of a lien against the debtor's Blauvelt property. Therefore, the January 29, 1991 Order to Show Cause does not violate the automatic stay because it in no way interferes with property of the estate.

Finally, the January 29, 1991 Order to Show Cause seeks an adjudication of contempt for the debtor's failure to make payments of the monthly interest and late charges on the Barclay Home Equity Loan on the marital home for the months of October, November and December 1990 and January 1991.

■ The obligation of the debtor to pay the monthly interest and late charges on the Barclay Home Equity Loan is a nondischargeable debt under 11 U.S.C. § 523(a)(5) because it is in the nature of alimony, maintenance and child support. Thus, under 11 U.S.C. § 362(b)(2), the debtor's former spouse is not prohibited by the automatic stay, from the collection of the Barclay obligation and is not subject to contempt sanctions or a finding of damages under 11 U.S.C. § 362(h).

■ The second phase of this court's analysis with respect to the alleged automatic stay violation focuses upon the extent to which the filing of a proceeding for criminal contempt violations 11 U.S.C. § 362. One of the few exceptions to the automatic stay provisions imposed by 11 U.S.C. § 362 is found in 11 U.S.C. § 362(b) which provides as follows:

The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)), does not operate as a stay—

(1) under section (a) of this section, of the commencement or continuation of a criminal action or proceeding against the debtor.

The rationale, as set forth in the legislative history of § 362(b) is that "[t]he bankruptcy laws are not a haven for criminal offenders, but are designed to give relief from financial over-extension." House Report No. 95–595, 95th Cong., 1st Sess. (1977) 342. Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 51, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5837, 6299.

In keeping with the spirit of 11 U.S.C. § 362(b)(1), this court has consistently allowed parties to utilize the legislatively created exception to the automatic stay as found in 11 U.S.C. § 362(b)(1). *See, In re Cohoes Indust. Terminal, Inc.,* 62 B.R. 369 (Bankr.S.D.N.Y.1986), *aff'd,* 70 B.R. 214 (S.D.N.Y.1987) (A state court prepetition order which does not relate to the collection of property of the estate may be enforced by contempt proceedings against a debtor in order to vindicate the dignity of the state court without violating the automatic stay.); *In re Cinnabar 2000 Haircutters, Inc.,* 20 B.R. 575 (Bankr.S.D.N.Y.1982) ("[T]he bankruptcy laws should not be a haven for contemnacious conduct in violation of a party's judicially-determined tradename rights which will be diluted by continuation of such conduct behind the shield of the automatic stay.").

This court will not allow this debtor to hide behind the cloak of the automatic stay provision of the Bankruptcy Code to the extent that he is in contempt of an order issued from a state court judge. The debtor's former spouse is not in violation of the automatic stay to the extent she has instituted an action for criminal contempt as a result of the debtor's alleged contemnuous conduct.

### Conclusions of Law

1. This court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding as set forth in 28 U.S.C. § 157(b)(2)(I) and § 157(b)(2)(A).

2. The debtor's $228,000 obligation to Barclay's Bank is in the nature of support and maintenance and is non-dischargeable pursuant to 11 U.S.C. § 523(a)(5)(B).

3. In accordance with 11 U.S.C. § 541(a)(6), the earnings of the debtor, post-petition, from his individual services are not property of the estate.

4. The Income Execution mailed to the debtor by his former spouse did not violate the automatic stay because it seeks to attach his post-petition income, which is not property of the estate, in satisfaction of the non-dischargeable Barclay obligation.

5. The debtor's former spouse did not violate the automatic stay by filing an Order to Show Cause with the Supreme Court of Westchester County on January 29, 1991 because the relief she seeks does not involve property of the estate.

6. The filing of the January 29, 1991 Order to Show Cause seeking an adjudication of criminal contempt did not violate the automatic stay because 11 U.S.C. § 362(a)(1) excepts the commencement of criminal proceedings from the constraints of the automatic stay.

7. The debtor's Order to Show Cause dated February 5, 1991 which seeks sanctions for violation of the automatic stay is denied.

SETTLE ORDER on notice.