**In re Richard D. HARP, and Maudie J. Harp, Debtors.**

**Bankruptcy No. 92–72133.**

United States Bankruptcy Court, N.D. Alabama, W.D.

June 15, 1993.

Andre M. Toffel, Birmingham, AL, for debtors.

Helen H. Ellis, Tuscaloosa, AL, Bankruptcy Administrator's Office.

Herbert M. Newell, III, Tuscaloosa, AL, for Unsecured Creditors Committee.

### MEMORANDUM OF DECISION

GEORGE S. WRIGHT, Chief Judge.

This matter came before the court on the motion of the Bankruptcy Administrator for a status conference to allow the debtors Richard D. Harp and Maudie J. Harp to explain to the court why they ceased to comply with the operating order in their Chapter 11 bankruptcy by placing funds in a bank account not labelled as that of a Chapter 11 debtor-in-possession. The hearing revealed a disputed point of law between the debtors-in-possession and the Unsecured Creditors

Committee over whether postpetition, preconfirmation income of an individual Chapter 11 debtor belongs to the bankruptcy estate or to the debtor.

The court has heard the arguments of the parties, studied their briefs and done further research into both the law and the facts. The court finds that all of the Harps' postpetition, preconfirmation income belongs to the bankruptcy estate.

## FINDINGS OF FACT

Dr. Richard D. Harp and his wife, Maudie J. Harp, filed their petition for Chapter 11 reorganization (Doc. 1) on September 1, 1992. With that filing, the Harps became both bankruptcy debtors and trustees for the creditors of the bankruptcy estate in the dual role of debtors-in-possession in Chapter 11.

From the beginning, this case has been an acrimonious one—the kind of case that infuriates creditors and gives the general public a negative impression of the bankruptcy system. The tone for the case and the demeanor of the debtors was revealed by the following three proceedings within the first three months of bankruptcy:

—A major secured creditor challenged their $950.00–per–month rental of a home in Tuscaloosa (Doc. 38) in addition to the home they then owned in Jasper, Ala.; a condominium at the exclusive NorthRiver Yacht Club also in Tuscaloosa; a condominium in Florida and other properties too numerous to mention in one functional paragraph.

—Furthermore, according to AP 92–71314, the Harps told creditors at their Section 341 meeting that they intended to exercise their time share rights in Pelican Resort located in the Netherlands Antilles. AmSouth Bank of Walker County sought to have the trip enjoined in the November 5, 1992 suit because it said the Harps "must pay air fare and incur other expenses for food and entertainment during their visit in addition to the $1,100 maintenance fee ..." By the time a hearing could be set, the issue was moot. The courtroom notes in the AP reflect the Harps had already gone. (Doc. 3, AP 92–71314)

—The bank sought another injunction when the Harps and another couple sent out invitations for a large pre-Alabama-Auburn game brunch to be held at the Carraway–Davie House in Birmingham on Thursday, November 26, 1992. The complaint was dismissed November 23, 1992. (A copy of the invitation to the party was attached to the formal complaint as an exhibit, a first for this court.)

The Bankruptcy Administrator's Office had entered this court's usual Chapter 11 Operating Order (Doc. 5) September 3, 1992. It contains the paragraph that caused this present issue to surface.

At the time the bankruptcy petition was filed, the Harps were residents of Jasper, Ala., with a 19–year–old son and a 22–year–old daughter included in the household. On the schedules filed with his bankruptcy petition, Dr. Harp listed his occupation as "physician", and his "Employer name" as Radiology Associates of North Alabama where he had worked for 24 years. (Doc. 1)

Dr. Harp reported his gross monthly income from the clinic at $23,925.00 on Schedule I of the bankruptcy petition, $16,451.00 in take-home pay. In addition to deduction of payroll taxes and Social Security, a payroll deduction labelled "profit sharing loan" of $1,329.82 was listed.

(Claim No. 31 lists a $28,688.41 debt to the profit sharing plan of Radiology Associates of North Alabama as of December 2, 1992. The claim is filed as "secured" but documents evidencing a security interest are not attached—as required by Fed.R.Bankr.P. 3001(d). There is nothing in the record to indicate this payroll deduction is not for a prepetition indebtedness.)

With the addition of other sources of income, Schedule I showed a take-home pay of $17,251.00. Dr. Harp is a director and shareholder for Radiology Associates of North Alabama, P.C. Mrs. Harp and the son and adult daughter reported no income.

Schedule J shows the problem that brought the Harps to bankruptcy—the couple reported recurring and/or fixed monthly expenses totalling $27,587.05, not including payment of real estate taxes or property

insurance. Thus, the Harp "enterprise" reflected a $10,336.05 operating deficit each month without even paying property taxes or insurance.

In documents filed with their petition, the Harps reported assets totalling $1,466,776.00 and liabilities of $1,894,964.10 to 41 creditors.

At the beginning of the case, they reported owning real property valued at $895,000.00 and personal property worth $571,776.00.

The real property reported initially included their home (now surrendered to the two banks holding liens on it) at 1405 Valley Road at Jasper; two and a half acres adjacent to that home site; a condominium, # 709 Lagoon Towers at Bay Point, Fla.; a condominium on the golf course at NorthRiver Yacht Club in Tuscaloosa (9 River Ridge Townhomes which the debtors later indicated they were selling); weeks # 45, and 46 in a time share condominium at St. Martin, Netherland Antilles; and a $600,000 lot (encumbered by $625,000 in debt) at Sailfish Point in Florida.

On their schedule B listing of personal property, the Harps stated the value was "unknown" on large quantities of diamond and gold jewelry, furs, silver and other luxury items.

However, Exhibit 1 to Doc. 162 docketed later in the file is an appraisal of this property for insurance by Auto Owners Insurance Co. Doc. 162 is a motion by the Unsecured Creditors' Committee attempting to force the debtors to sell this property to pay administrative expenses.

The appraisal values the jewelry at a total $83,519.00; the furs at $14,595.00 and the silver items at a total $38,250.00 The appraisal was for a policy which ran from March 28, 1992 to March 28, 1993, the document shows.

The Harps also listed Dr. Harp's interest in the clinic's profit sharing plan at $500,-000.00, and reflected that it was not encumbered by debt.

Doc. 5, filed September 3, 1992, is the Chapter 11 Operating order routinely entered to provide guidelines for debtors-in-possession in each newly filed Chapter 11 case. The Bankruptcy Administrator's Office is charged with the duty of administering Chapter 11 and Chapter 7 liquidation proceedings.

At issue in this dispute is Paragraph D of that order which states:

### D. PROOF OF NEW BANK ACCOUNTS

When the Debtor opens a new account, it must file with the *Bankruptcy Clerk's Office* no later than the date set out in paragraph A (September 24, 1992, the date of the debtors-in-possession's intake meeting with the Bankruptcy Administrator's Office):

1. The first check from the new account;

2. A copy of a signature card for every account in use after the date of filing the bankruptcy petition bearing the words "Chapter 11 Debtor in Possession—Bankruptcy Case No. 92–72133;" and

3. A reconciled bank statement from every account in use before the filing of the bankruptcy petition.

The order directed the debtors-in-possession to open new bank accounts on the date of the filing of the Chapter 11 or upon receipt of the operating order.

On September 8, 1992, the debtor-in-possession opened what is known as a debtor-in-possession checking account (No. 00160077503 with Security Federal Savings Bank in Jasper) with a $1.00 deposit, according to a report by the Bankruptcy Administrator's Office. (Doc. 159. The report was requested by the court for informational purposes after this case was under submission.) The debtors provided no explanation for the delay, according to the report. Dr. Harp's payroll checks and various smaller payments for oil and gas royalties have been deposited in this account.

On September 28, 1992, the debtor-in-possession opened a debtor-in-possession savings account (No. 00100050484 with the same bank) with an initial deposit of $5,000.00. The Bankruptcy Administrator's office had no information on the source of the funds, the report showed.

Dr. Harp provided the Bankruptcy Clerk's Office with copies of the signature cards that properly reflected that the accounts were those of debtors-in-possession in a Chapter 11 bankruptcy case.

(In individual cases, the individual debtor(s) will write checks as the debtor-in-possession. However, the "Chapter 11 Debtor-in-Possession" designation puts the bank on notice that such accounts are trust accounts for the debtors' creditors and signatures should be checked carefully.)

From that point until December 11, 1992, all income reported to the Bankruptcy Administrator's Office flowed into these two accounts.

However, on December 11, 1992, the Harps as individuals opened another savings account (No. 0100050816 at the same bank) with $8,321.26. The signature card on this account did not bear the words "Chapter 11 Debtor in Possession" as required by the operating order, the Bankruptcy Administrator's report said. The report said, p. 1:

> The debtors opened this account by transferring $8,321.26 from the debtor in possession savings account, leaving a balance in the debtor in possession savings account of $500.00.

The Harps neither sought nor received permission of the court to transfer funds from a DIP account into their personal account. The Bankruptcy Administrator's report continued, p. 1:

> Two other deposits have been made to this account: (1) a deposit of $6,214.37 on December 15, 1992, the source of which we do not know; and (2) a deposit of $38,367.50 on December 31, 1992 which we believe to be the net of Dr. Harp's reported year-end bonus of $57,714.02 ... Since December 21, 1992, the debtors in possession have transferred $17,285.42 from this non-debtor in possession savings account to the debtor in possession checking account.

However, the Harps' subsequently filed disclosure statement, Doc. 148, called the bonus a "6 month" bonus of $57,714.02 "after taxes". The disclosure statement also said the Harps claim the two thirds of the bonus they allege was earned postpetition.

Additionally, the Disclosure Statement provides a clue on the amount in that it said:

> The Debtor firmly believes that they (sic) are entitled to two-thirds of the bonus, calculated as two months of bonus attributable to prepetition employment and, four months of bonus attributable to post-petition employment.

On December 21, 1992, the Harps had filed their first request for an extension of time to file their disclosure statement and reorganization plan whereby they would begin to repay their creditors. (Doc. 94) The court granted the debtors an extension to February 1, 1993. (Doc. 97)

On January 27, 1993, a Bankruptcy Administrator's Motion for Status Conference was filed which asked the court to provide a forum at which the debtors might ask for a modification of Paragraph D, since because of the new account and its deposits, the Harps were no longer in compliance with Paragraph D. (Doc. 113)

Attached to the Bankruptcy Administrator's Motion is a letter from one of the debtors' counsel, Martin S. Lewis, Esq., stating, in effect, that the Harps regarded all the doctor's post-bankruptcy earnings as not being property of the estate.

It reads:

> Pursuant to our conversation yesterday, please be advised that the Harps will be withdrawing all funds, except for a nominal amount in order to keep the account open from their DIP account and moving the monies into a different savings account.

> As we discussed, the reasons we are doing this are twofold. First, Dr. Harp's post petition earnings are not property of the estate and as a result, it would be improper for he (sic) to put these monies in the DIP account. 11 U.S.C. § 541(a)(6). Also, if assets of the bankruptcy estate are sold, or if any income arises from property of the estate, we do not want to commingle property of the estate with property that is not part of the estate.

> When the new savings account is opened, I will forward you a copy of the account card pursuant to your request. If you have any

questions or comments, please do not hesitate to contact me.

Doc. 114 is the notice that originally set a hearing on this issue for February 11, 1993. On February 1, 1993, the Harps asked for their second extension of the exclusivity period to file the disclosure statement and plan of reorganization. (Doc. 117) The court granted an extension to April 1, 1993 on February 3, 1993. (Doc. 119)

On February 11, 1993, the hearing on the motion by the Bankruptcy Administrator was continued until February 19, 1993 at the request of the debtors' counsel and Helen H. Ellis, estate analyst for the Bankruptcy Administrator's Office. (Doc. 123)

On February 19, 1993, the court heard the stated position of Andre Toffel, Esq., attorney for the Harps, and Herbert M. Newell III, Esq., attorney for the Unsecured Creditor's Committee. The court directed both sides to provide two-page briefs on the issue of whether Dr. Harp's postpetition income belongs to the bankruptcy estate or to Dr. Harp.

Counsel for the Unsecured Creditors cited the scant case law that exists in this area to argue that Dr. Harp's postpetition income is property of the bankruptcy estate, that this income is the "enterprise" for which the couple seeks Chapter 11 reorganization. Dr. Harp, like a CEO of a corporation, however, should be considered an employee of the "enterprise" and could draw a reasonable income while sharing the rest with creditors, the representative for the unsecured creditors argued.

In the alternative, the Unsecured Creditors Committee argued that the court should allow evidence that part of Dr. Harp's income stream is actually generated by his prepetition ownership of one-fifth of the radiology clinic.

The Harps' brief contended that individual Chapter 11 debtors' postpetition income is not property of the bankruptcy estate and cannot be reached or used to repay prepetition debt. They also argued that there is no reason to require evidence that Dr. Harp's income is actually generated by his stock in the radiology clinic, since that was reported as an asset on his schedules.

Meanwhile, the April 1, 1993 deadline for filing of a disclosure statement of plan and reorganization for the Harps passed once again without the required filing. The Bankruptcy Administrator's Office on April 13, 1993 filed another motion for a status conference where the Harps would be required to show cause why they had missed the third deadline set for the plan and disclosure statement.

The Harps did file a disclosure statement and proposed plan for reorganization with the court stamped into the file on April 22, 1993, the date set for hearing on the Bankruptcy Administrator's status conference motion. A hearing has been set on that plan and disclosure statement for June 15, 1993.

In their plan of reorganization (Doc. 149), the Harps propose to pay allowed unsecured claims of $3,000.00 or less (Class 4) 100 cents on the dollar without interest within 30 days after the effective date of the plan.

However, they propose to pay holders of larger unsecured claims (Class 5) only 30 cents on the dollar over 60 months. Based on the debtors' own initial schedules, counting the unsecured portion of undersecured creditors' claims, this class could involve as many as thirteen creditors with claims totalling $470,157.68. (This plan itself does not state a total number of creditors, nor a total obligation in Class 5).

At the same time, the plan also states the four members of the family will retain five automobiles, three of which are Mercedes–Benz', the condominium in Florida via payments to secured creditors and other assets. They are presently living in the leased home in Northport in Tuscaloosa County while the NorthRiver condominium they own here has been put up for sale.

Of the cars, the plan says: "All but the 1985 Mercedes–Benz 300D and the 1984 Dodge B250 Van were financed post-petition." The three vehicles were apparently purchased after the debtors filed bankruptcy, and without court approval. They included a 1990 Mercedes–Benz 350SDL, a 1990 Ford Bronco and a 1984 Dodge B250 van. All are

financed with America's First Credit Union which, as noted above, has received a total $9,227.37 from the Harps since they filed bankruptcy.

At the time they filed bankruptcy, the Harps' petition showed they owed America's First Credit Union $14,114.60 on two vehicles. According to their plan of reorganization, they borrowed another $76,000.00 from this creditor to finance the three additional cars after they filed bankruptcy—without authorization of the court.

From September 1, 1992 until the present, the Harps have made no payments to creditors under a confirmed plan of reorganization. So the expenses listed in the Bankruptcy Administrator's Report are apparently the personal expenses of the debtors.

For the seven months the Harps had been in bankruptcy by the end of March, they reported income of $245,587.45 and expenditures of $206,772.45. The Bankruptcy Administrator's report reflects:

> The monthly receipts range from a low of $23,925.00 in October of 1992 to $82,439.02 in December 1992, which included a gross year-end bonus of $57,714.02.

Dr. and Mrs. Harp's reorganization plan said:

> Dr. Harp is employed by Radiology Associates of North Alabama, P.C. He received a bonus from his employer in December of 1992, and he will satisfy all Administrative Claims and all Class 4 Claims with those funds; to the extent that any funds remain from the bonus, the same will be applied to the Tax Claims. All remaining Allowed Claims will be paid from future earnings and bonuses of Dr. and Mrs. Harp.

During the seven months between the filing of the bankruptcy petition and the end of March, 1993, the Harps reported spending $206,772.45 in various personal expense categories.

The Bankruptcy Administrator's Report to the court categorized these expenditures into two classes—"Insufficiently described disbursements" and "Sufficiently described disbursements."

"Insufficiently described disbursements" totalled $58,426.27 listed in the following broad categories:

**Maintenance—$15,595.65.**

**American First Credit Union (paid Dec. '92)—$9,227.37**

**Miscellaneous—$8,425.02**

**American Express—$6,578.28**

**Profit Sharing Loan—$5,689.07**

**Cash—$3,530.00**

**Other—$3,468.00**

**Car purchase (Dec. '92)—$2,951.42**

**Various individuals—$1,260.35**

**Department stores—$917.77**

**Travel Designers—$809.33**

**Co–Co's—$274.01**

Expenditures categorized as "Sufficiently described disbursements" by the report include the following:

**Taxes withheld—$61,856.56**

**Food—$1,848.80**

**Home—**

  **Mortgage/rent—$5,700**

  **Real estate taxes—$67.23**

  **Home insurance—$200.97**

  **Content insurance—$340.00**

  **Housekeeper—$1,020.76**

  **Utilities—$4,512.18**

  **Telephone—$3,289.90**

  **Moving expense—$2,314.90**

**Auto—**

  **Insurance—$3,565.37**

  **Gas & Maintenance—$5,889.60**

**Medical—$2,683.11**

**Disability Insurance—$219.00**

**Clothing and cleaning—$1,515.86**

**Family support—**

  **College costs—$21,321.64**

  **Mrs. Harp's mother—$2,400.00**

**Dues:**

  **NorthRiver Yacht Club—$3,087.85**

  **Bay Point (Florida condominium)—$2,037.75**

  **Summit Club—$342.58**

  **Musgrove Country Club—$62.00**

  **University of Alabama—$30.00**

Legal fees—$21,263.09

Accountant fees—$1,500.00

**Miscellaneous (for which purpose given)—$977.03**

The Bankruptcy Administrator's Office queried the Harps' counsel about the payments where insufficient information was provided, or where there was a concern for payment of prepetition debt.

In a letter dated March 10, 1993, the Harps' counsel replied:

> With regard to the other documents and information that you have requested, the debtors would prefer to wait until Judge Wright makes a ruling regarding Dr. Harp's post-petition income before providing any more information to the Administrator's Office regarding these particular items. Please contact me and let me know if this presents a problem.

The totals on receipts and expenditures underline the gravity of the issue the court is being asked to decide. For the seven-month period ending March 30, 1993, the Harp family, the bankrupt enterprise, took in $245,587.45 and spent $206,772.45.

If all this income belongs to the estate, this bankrupt enterprise made a profit of $38,815.00. However, if the $35,925.68 in the non-debtor-in-possession account belongs to the Harps as individuals, the enterprise made only $2,889.92.

After receipt of briefs of the parties, the court had taken the issue under advisement March 8, 1992.

### CONCLUSIONS OF LAW

The key legal issue to be decided in this case is whether the postpetition, preconfirmation earnings of an individual Chapter 11 debtor belong to the bankruptcy estate (as would the earnings of a corporate Chapter 11 debtor) or to the individual.

The key factual issue to be decided is whether the actions of the Harps involve a breach of their statutory duties as trustee for their own creditors.

### I.

*A Chapter 11 debtor-in-possession, whether corporate or individual, has fiduciary responsibilities to creditors and to the court*

**A. A Chapter 11 debtor-in-possession is an odd legal entity—the debtor acts both for the debtor, itself; and for creditors and other parties in interest.**

A Chapter 11 debtor-in-possession is a legal concept like no other under the Bankruptcy Code. In most cases in Chapter 11, the debtor-in-possession also acts as representative of the bankruptcy estate, that pool of resources to be restructured so that the enterprise can continue to operate while paying at least part of its prepetition debt.

■ In a nutshell, Chapter 11 debtors-in-possession like Dr. Richard D. and Maudie J. Harp have fiduciary responsibilities to unsecured creditors and other parties in interest requiring them to act in the capacity of a bankruptcy trustee.[1] Breach of these fiduciary responsibilities can result in personal liability. Additionally, lawyers representing debtors-in-possession are also charged with special responsibilities of insuring that when the interest of the estate conflicts with the interest of the individual who signs his checks, that the interest of the estate prevails.[2]

■ What do those "fiduciary responsibilities" mean to a debtor-in-possession? They imply a special burden on debtors such as the Harps to ensure that the resources that

---

**1.** See *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451 (6th Cir.1982); *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)* 780 F.2d 1223 (5th Cir.1986); *Fulton State Bank v. Schipper (In re Schipper)* 933 F.2d 513 (7th Cir.1991); *Gumport v. China International Trust and Investment Corp. (In re Intermagnetics America, Inc.)* 926 F.2d 912 (9th Cir.1991); *Phil-* lips v. First City, Texas–Tyler, N.A. (Matter of Phillips) 966 F.2d 926 (5th Cir.1992); *In re Analytical Systems, Inc.*, 97 B.R. 676 (Bankr.N.D.Ga. 1988) *rev.'d on other grounds*, 933 F.2d 939 (11th Cir.1991) and *In Matter of Fiesta Homes of Georgia, Inc.*, 125 B.R. 321 (Bankr.S.D.Ga.1990).

**2.** See *In re Sky Valley, Inc.*, 135 B.R. 925 (Bankr. N.D.Ga.1992) and *In re Whitney Place Partners*, 147 B.R. 619 (Bankr.N.D.Ga.1992).

flow through the debtor-in-possession's hands are used to benefit the unsecured creditors and other parties in interest.[3]

"Fiduciary responsibility," like the term "honor," can encompass many varieties of conduct. Some of those, however are tangibly spelled out in the Bankruptcy Code. 11 U.S.C. § 1107(a)[4] provides that a Chapter 11 debtor-in-possession shall perform most of the duties assigned to a trustee by 11 U.S.C. §§ 1106 and 704.[5]

**B. The attorney for a Chapter 11 debtor-in-possession is in a special position of trust for the welfare of all parties in interest.**

It is not easy for a debtor-in-possession, corporate or individual, to serve two masters—juggling the personal needs and desires of the debtor itself, with its clear fiduciary responsibilities to unsecured creditors, other parties in interest and the court.

Nor is the role any easier for the attorney who represents the debtor-in-possession.

As stated by *In re Whitney Place Partners*, 147 B.R. 619, 620–21 (N.D.Ga.1992):

In a Chapter 11 case, the debtor in possession has a fiduciary duty to act *not in its own best interest, but rather in the best interest of the entire estate, including secured and unsecured creditors. Commod-*

---

3. *Black's Law Dictionary* (Fifth Edition) defines "fiduciary capacity" as follows:
   One is said to act in a "fiduciary capacity" or to receive money or contract a debt in a "fiduciary capacity," when the business which he transacts or the money or property which he handles, *is not his own or for his own benefit,* but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and *a high degree of good faith on the other part.* The term is not restricted to technical or express trusts, but includes also such offices or relations as those of an attorney at law, a guardian, executor, or broker, a director of a corporation, and a public officer. (emphasis added)

4. 11 U.S.C. § 1107(a) provides:
   (a) Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right of compensation under section 330 of this title, and powers *and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3) and (4) of this title, of a trustee serving in a case under this chapter.* (emphasis added)

5. 11 U.S.C. § 1106(a)(1), (5), (6) and (7) are trustee duties specifically laid upon the debtor-in-possession by § 1107(a). These sections provide:
   (a) A trustee (debtor-in-possession) shall—
   (1) perform the duties of a trustee specified in sections 704(2), 704(5), 704(7), 704(8) and 704(9) of this title;
   (5) as soon as practicable, file plan under section 1121 of this title, file a report of why the trustee (debtor-in-possession) will not file plan, or recommend conversion of the case to a case under chapter 7, 12 or 13 of this title or dismissal of the case;

(6) for any year for which the debtor has not filed a tax return required by law, furnish, without personal liability, such information as may be required by the governmental unit with which such tax return was to be filed, in light of the condition of the debtor's books and records and the availability of such information; and
(7) after confirmation of a plan, file such reports as are necessary or as the court orders.
   **11 U.S.C. § 704(2), (5), (7), (8) and (9), cited in § 1106(a)(1)** as responsibilities for both a Chapter 11 debtor-in-possession and a trustee include the following:
   **Duties of trustee** (debtor-in-possession).
   The trustee (debtor-in-possession) shall—
   (2) *be accountable for all property received;*
   (5) if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper;
   (7) *unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest;*
   (8) if the business of the debtor is authorized to be operated, file with the court, with the United States trustee (in Alabama, the Bankruptcy Administrator's Office), and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, *periodic reports and summaries of the operation of such business,* including a *statement of receipts and disbursements,* and such other information as the *United States trustee (bankruptcy administrator) or the court requires;* and
   (9) make a final report and file a final account of the administration of the estate with the court and with the United States trustee. (emphasis added)

*ity Futures Trading Commission v. Wein-traub,* 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *In re Doors and More, Inc.,* 126 B.R. 43 (Bankr.E.D.Mich. 1991). As noted in the *Weintraub* case, this fiduciary duty to creditors which inheres in the bankruptcy system causes fundamental changes in the nature of relationships between the debtor and its principals and between the debtor and its creditors. *The attorney for the debtor in possession is also a fiduciary to the estate. Doors & More,* 126 B.R. 43.

The unique circumstances which surround insolvency and the filing of a Chapter 11 case place *the attorney for the debtor in possession in the unusual position of sometimes owing a higher duty to the estate and the bankruptcy court than to his client.* In fact, the status of the client and the attorney may often overlap in a Chapter 11 case, as the debtor's attorney must take conceptual control of the case and provide guidance for management of the debtor, not only to discern what measures are necessary to achieve a successful reorganization, *but to assure that, in so doing, compliance with the Bankruptcy Code is sought rather than avoided.* Debtor's attorney's duty as fiduciary of the estate requires an active concern for the interests of the estate and its beneficiaries. *In re Consupak, Inc.,* 87 B.R. 529 (Bankr. N.D.Ill.1988). The attorney for a debtor in possession is not merely a mouthpiece for his client. "[C]ounsel for the estate cannot close their eyes when the debtor's principals are not acting in the best interests of the estate and its creditors, and *certainly cannot aid the adverse activity.*" *In re Rusty Jones, Inc.,* 134 B.R. 321 (Bankr. N.D.Ill.1991) (emphasis added)

The complex fiduciary duties of a Chapter 11 debtor-in-possession and its counsel can become even more confused when the debtor(s)-in-possession are individuals like Dr. Richard D. and Maudie J. Harp.

## II.

*There is no binding authority in the Eleventh Circuit on whether 11 U.S.C. § 541(a)(6) exempts all or part of an individual Chapter 11 debtor's earnings from the bankruptcy estate.*

A. **In 1991, the United States Supreme Court held in *Toibb v. Radloff,* that an individual debtor not engaged in business is eligible to reorganize under Chapter 11.**

■ When the Supreme Court of the United States ruled in *Toibb v. Radloff,* 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) that individuals not engaged in business could file to reorganize their finances under Chapter 11, it was resolving a split on this question among the circuits. Dr. Harp, of course, is an individual engaged in a business, his medical practice.

The Supreme Court holding made little difference in the Eleventh Circuit where individuals have been allowed to reorganize in Chapter 11 under the authority of *In re Moog,* 774 F.2d 1073 (11th Cir.1985). For the most part, individual debtors seek reorganization under Chapter 11 rather than the simpler, less expensive Chapter 13, because they have too much debt to file Chapter 13.

Only "individuals with regular income" who owe less than $100,000.00 in unsecured debt; secured debt of less than $350,000.00 may file a Chapter 13 reorganization. *See* 11 U.S.C. § 109(e). Increasingly, individuals, particularly operators of small businesses who have personally guaranteed business loans or highly paid professionals, are seeking Chapter 11 reorganization because their obligations exceed the debt limits for Chapter 13.

The Harps' original schedules listed a total of $315,652.23 in totally unsecured debt (not counting the deficiencies shown on some undersecured, secured creditors) and $1,579,-309.87 in secured debt.

*Toibb* made it clear that while the Supreme Court acknowledged that Congress probably intended Chapter 11 primarily for use by business, there was nothing in the "plain language" of the code to bar an individual, even an individual not involved in a

business, from reorganizing under Chapter 11.

Unfortunately, dicta in the opinion, as the high court answered one of the arguments of amici opposing allowing individuals in Chapter 11, has created further confusion.

Involuntary bankruptcy proceedings are not allowed in Chapter 13, the amici argument pointed out. Involuntary filings are allowed in Chapter 11. So those opposing individuals in Chapter 11, posed the hypothetical horror story of an involuntary individual Chapter 11 debtor forced into involuntary servitude as forbidden by the **Thirteenth Amendment.**

In answering this argument, the high court said:

> In any event, the argument overlooks Congress' primary concern about a debtor's being forced into bankruptcy under Chapter 13: that such a debtor, whose future wages are not exempt from the estate, § 1322(a)(1), would be compelled to toil for the benefit of creditors in violation of the Thirteenth Amendment's involuntary servitude prohibition. See HR Rep. No. 95–595, at 120. *Because there is no comparable provision in Chapter 11 requiring a debtor to pay future wages to a creditor, Congress' concern about imposing involuntary servitude on a Chapter 13 debtor is not relevant to a Chapter 11 reorganization.* (emphasis added)

*Toibb,* 501 U.S. at 165–66, 111 S.Ct. at 2201–02, 115 L.Ed.2d at 154.

Nor is it relevant to a *voluntarily filed* individual Chapter 11, like the Harps. Creditors did not force the Harps into bankruptcy by filing an involuntary petition. The Harps chose to file bankruptcy, and furthermore, they chose to file Chapter 11 instead of Chapter 7.

**B. Some courts have interpreted a subsection of 11 U.S.C. § 541, which defines the bankruptcy estate for all chapters, as excluding all or part of an individual Chapter 11 debtor's postpetition income from his Chapter 11 reorganization.**

The bankruptcy estate is basically that pool of assets and earning potential that is available for distribution to creditors in the order prescribed by the Bankruptcy Code. It comes into being by operation of law at the moment the bankruptcy petition is filed.

In a voluntary case, like Dr. and Mrs. Harp's, the debtors, themselves, call the estate into being.

Although there are notable exceptions, the bankruptcy estate is comprised of "all legal or equitable" property interests of the debtor "wherever located and by whomever held" when the petition is filed.[6]

11 U.S.C. § 541(a)(6) excludes "earnings from services performed by an individual debtor" postpetition from proceeds of estate property. Construction of this section is a key issue in the Harp case, and in other published decisions involving individuals in Chapter 11.[7]

**C. Courts have taken three different positions on whether an individual Chapter 11 debtor's postpetition earnings should be included in the bankruptcy estate.**

Three views of the issue have arisen in the courts as the numbers of individuals filing Chapter 11 instead of Chapter 13 has risen. They include the following theories applied in subtly, but critically, different fact situations:

---

6. 11 U.S.C. § 541(a) provides in pertinent part: (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such an estate is comprised of all the following property, *wherever located and by whomever held:*
(1) Except as provided in subsections (b) and (c)(2) of this section, *all legal and equitable interests* of the debtor in property as of the commencement of the case. (emphasis added)

7. 11 U.S.C. § 541(a)(6) provides the following will be property of the estate, yet offers an exception in the second phrase:
(6) Proceeds, product, offspring, rents and or profits of or from property of the estate, *except such as are earnings from services performed by an individual debtor after the commencement of the case.* (emphasis added)

—That all postpetition earnings by the individual Chapter 11 debtor are excluded from the estate by Section 541(a)(6).[8]

—That the debtor's postpetition income should be split under Section 541(a)(6), like the baby before King Solomon, based on exactly HOW the income was generated, with part being earmarked for the estate, part going directly to the debtor.[9]

—And that all the income flowing to an individual in Chapter 11 becomes property of the estate under Section 541(a)(7) pending confirmation of a plan, just as such property does in a corporate Chapter 11 reorganization.[10]

In the first two categories, the courts rely heavily on analogizing between an individual debtor in Chapter 11 and an individual in Chapter 13, as the dicta in *Toibb* would seem to suggest.

1. **The view that all postpetition income should be included relies on a construction of the last phrases of Subsection 541(a)(6) in isolation from the rest of the Section 541.**

All three cases cited in this category involve medical doctors as does the Harp bankruptcy. The court, in *In re Molina Y Vedia*, 150 B.R. 393 (Bankr.S.D.Tex.1992), held that Section 541(a)(6)'s seeming exception was not limited to the doctor's "salary" from the sole proprietorship he operated, but shielded all earnings of his practice. It cited the *Toibb's* Thirteenth Amendment concern as part of its rationale, analogizing with the situation with that of a Chapter 13 debtor where future income is specifically included in the estate by the Code.

The Chapter 11 debtor-in-possession in *In re Fernandez*, 97 B.R. 262 (Bankr.E.D.N.C. 1989) was an emergency room physician employed by a professional corporation of which he was the sole owner. This doctor had asked the bankruptcy court's permission to receive and maintain his $9,500.00–per-month income from the P.C. The court allowed Dr. Fernandez to keep his income, reading Section 541(a)(6) to provide an exception. However, the court made comments pertinent to the Harp situation:

> Chapter 11 is designed primarily for businesses, but an individual whose income is primarily wages may be a Chapter 11 debtor as well. This does not mean that a chapter 11 wage earner case will be handled in the same way as a large corporate case. Typically, *the wage earner will not need 120 days to file a plan* and it is this court's practice to require that the plan be filed more quickly. There is no good reason why most consumer chapter 11 cases should not be put on a fast track. *After all, chapter 13 debtors must file their plans with the petition or within 15 days thereafter.* Bankruptcy Rule 3015 ...

There is one other matter which should be mentioned. The debtor's application states the debtor needs his salary of $9,500.00 per month for personal living expenses. *If the debtor's plan provides that the debtor will use his substantial income to make heavy mortgage payments on a lavish house, to pay for luxury cars, and to generally support an extravagant lifestyle, the plan may not meet the confirmation requirements of 11 U.S.C. § 1129(a).*

*Fernandez* at 263.

So far, the Harps have been in bankruptcy nine months without beginning to pay creditors under a confirmed plan.

The documents in the main case file and the records of the Bankruptcy Administrator's Office reveal the profile of debtors who retain $136,364.00 worth of jewelry, furs and silver; luxury automobiles; memberships in

---

8. *See Larson v. Cameron (In re Larson)* 147 B.R. 39 (Bankr.D.N.D.1992); *In re Molina Y Vedia*, 150 B.R. 393 (Bankr.S.D.Texas 1992); *Gautier v. El-Amin*, 126 B.R. 855 (Bankr.E.D.Va.1991) and *In re Fernandez*, 97 B.R. 262 (Bankr.E.D.N.C. 1989).

9. *See FitzSimmons v. Walsh (In re FitzSimmons)* 725 F.2d 1208 (9th Cir.1984); *In re Cooley*, 87 B.R. 432 (Bankr.S.D.Tex.1988); *In re Paolino*, slip op. 85–00759F, 1991 WL 284107 (Bankr. E.D.Pa.1991) and *Altchek v. Altchek (In re Altchek)* 124 B.R. 944 (Bankr.S.D.N.Y.1991).

10. *See In re Herberman*, 122 B.R. 273 (Bankr. W.D.Tex.1990).

five private clubs; a condominium in Florida and a time share in the Netherlands Antilles in addition to two residences in the city where they now live.

Instead of speedily putting together a plan within the first 120 days of the bankruptcy as suggested by *Fernandez,* the Harps were planning pregame parties and vacationing offshore.

This can only be described as a "lavish" lifestyle compared to that of most Alabamians.

**2. The only court of appeals to have considered the issue split the debtor-in-possession income between the debtor and the estate, the most common approach taken by the courts.**

So far, only one of the courts of appeal appears to have considered the issue of what, if any, Section 541(a)(6) exempts from an individual Chapter 11 debtor's bankruptcy estate.

The Ninth Circuit in *FitzSimmons v. Walsh (In re FitzSimmons),* 725 F.2d 1208 (1984) found that under Section 541(a)(6) a lawyer's earnings attributable to the debtor's own personal services were excepted from the estate, while income that could be identified as "proceeds" of "property of the estate" was not.

The court held other income from the law practice's invested capital, accounts receivable, good will, employment contracts with the firm's staff, client relationships, fee agreements or the like went to the estate.

This court also analogizes between the situation of an individual in Chapter 11 to a Chapter 13 individual wage earner debtor. As *FitzSimmons* said:

[C]ongress knew how to override this general applicability of § 541(a)(6) when it wanted to do so. For example, Code § 1306 removes the earnings exception from Chapter 13 cases by providing that:

(a) Property of the estate includes, in addition to the property specified in section 541 of this title— . . .

(2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7 or 11 of this title, whichever occurs first.

If Congress had intended to make the earnings exception inapplicable to Chapter 11 cases, we believe that it would have done so explicitly, as it did in § 1306. *FitzSimmons* at 1211.

In *FitzSimmons,* the bankruptcy court (the trial court) had found that *all* of the debtor's law practice income went to the estate. The Bankruptcy Appellate Panel for the Ninth Circuit (the intermediate appeals court) had held that *none* of the practice income went to the estate.

The Ninth Circuit, in effect, reversed both courts with a finding that directed the bankruptcy court to determine exactly how much income the debtor generated *personally* each month, holding that amount would be exempt from the estate under Section 541(a)(6). The estate would get the rest of the income from the practice.

Other cases which have taken this approach include *In re Cooley,* 87 B.R. 432 (Bankr.S.D.Tex.1988); *Altchek v. Altchek, (In re Altchek )* 124 B.R. 944 (Bankr.S.D.N.Y. 1991) and *In re Paolino,* 1991 WL 284107, slip op 85–00759F (Bankr.E.D.Pa. Jan. 11, 1991).

**3. *In re Herberman, M.D.,* 122 B.R. 273 (Bankr.W.D.Tex.1990) looked at an individual using Chapter 11 based on the same equities that would apply to a corporate debtor-in-possession, holding that all income of the bankrupt enterprise belongs to the estate.**

*In re Herberman,* like almost all of the cases cited in this memorandum, involved a medical doctor, a urologist. Bankruptcy Judge Leif M. Clark (W.D.Tex.) held that the fiduciary duties which Dr. Herberman assumed when he voluntarily filed a Chapter 11 bankruptcy petition had to result in *self-imposed* limitations on his handling of the income of the enterprise.

This case is of particular interest because it properly examines the rights claimed by the debtor under Section 541(a)(6) in the

general context of all of 11 U.S.C. § 541 and of the Chapter 11 debtor-in-possession's special fiduciary duties to his own unsecured creditors.

The decision held that Dr. Herberman and other service professionals like lawyers and dentists filing individual Chapter 11s should limit themselves to a "reasonable salary" for services as employees, with the rest of the income flowing into the estate.

Judge Clark's opinion wisely did not try to cram the individual Chapter 11 reorganization into the theoretical framework of a Chapter 13 reorganization, which has a very different legal structure. Both Chapter 11 and Chapter 13 may involve the reorganization of the financial affairs of individuals. However, they differ in critical areas.

The court found that Dr. Herberman's "reasonable compensation" was 75 percent of the income of the practice, with the remaining 25 percent flowing into the estate for the benefit of the creditors. Since the medical practice was a sole proprietorship, presumably, Dr. Herberman's 75 percent included overhead, employee pay and other business costs in addition to his personal compensation.

The doctor had a high-volume 20–year practice in El Paso, Tex., which he maintained by advertising in both English and Spanish. The court noted that he was limited to a few minutes with each patient and scheduled his surgeries "often back to back" at various El Paso hospitals. The doctor employed ten other people to schedule patients, take background information, channel patients into examination rooms, submit insurance forms, assure collections and schedule surgeries.

The income from the practice included the following:

1985: $127,000
1986: $479,000
1987: $430,000
1988: $547,554
1989: $698,631

Dr. Herberman contended that all postpetition income from his practice was excluded from the bankruptcy estate as his personal service earnings, relying on Section 541(a)(6) and the *Cooley* decision in Texas (already been cited above).

The creditors, most of whom were former business associates in investments outside the medical practice, maintained that all the debtor's income became property of the estate under Section 541(a)(7),[11] which reads simply that the bankruptcy estate includes "any interest in property the estate acquires" after the petition is filed.

Judge Clark discussed both the Ninth Circuit's *FitzSimmons* case involving the lawyer and *Cooley*. In *Cooley*, another Texas bankruptcy court had held that a renowned heart surgeon could keep all the postpetition income of the services provided by his practice—income he generated "personally" and income generated by 10 other heart surgeons he employed.

Judge Clark rejected the logic of both cases in a thoughtful discussion that for the first time takes into account *both* the impact of the debtor-in-possession's fiduciary duties and the effect of Section 541(a)(7).

In the view of this court, the statutory construction adopted by both *Cooley* and *FitzSimmons* reads past the plain meaning of Section 541(a)(6), and *similarly overlooks the plain thrust of Section 541(a)(7)*. In addition, the approach of these cases results in a construction of a special set of rules of interpretation for chapter 11 cases involving individuals (including sole proprietorships), when a much simpler, more harmonious (and hence preferable) rule that would apply equally to all chapter 11 debtors, regardless of legal form, is available. The approach of *Cooley* and *FitzSimmons* also *improperly glosses over the important interplay between the individual debtor's dual role as income generator and "trustee" (i.e. debtor-in-possession.)* (emphasis added)

*Herberman* at 277–78.

In his analysis of Section 541(a)(6), Judge Clark found that it applied only to "[p]rofits of or from property of the estate ..." and that the exception for "earnings from services performed by the debtor" applied only to

---

**11.** 11 U.S.C. § 541(a)(7) provides that the bankruptcy estate shall include:

(7) Any interest in property that the estate acquires after commencement of the case.

earnings that could be categorized as proceeds from estate property.

Thus, a doctor's billings, a lawyer's billings, a dentist's billings—indeed the billings of virtually any service-oriented enterprise fall *outside* the plain language of Section 541(a)(6). These are earnings by the debtor to be sure, but they are not "proceeds, product, offspring, profits or rents of or from property of the estate." Therefore, the "earnings exception" does not apply to them and they are not excluded from the estate by that exception, contrary to *Cooley* and *FitzSimmons.*

*Herberman* at 278.

Judge Clark concluded that Section 541(a)(7) governed personal service income in Chapter 11 bankruptcies and examined the section in the context of the broad policy goals sought by Congress in creating the bankruptcy estate.

Upon a voluntary chapter 11 filing, a bankruptcy "estate" is called into existence *by the debtor.* 11 U.S.C. §§ 301, 541, 1101. An estate is a separate legal identity, created on (and by) the filing of a bankruptcy petition, and continuing until confirmation, conversion, or dismissal of the case. 11 U.S.C. §§ 541(a), 1112. As such, an estate is more than just its property. It is an active legal *enterprise,* comprised of that property, to be sure, but also operating under the aegis of the Bankruptcy Code. It can sue and be sued. It can buy and sell property. 11 U.S.C. § 363. It can operate a business. 11 U.S.C. § 1108. It has a defined lifetime, at the conclusion of which assets are appropriately disposed of in accordance with applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1141. A chapter 11 estate has an operating officer, who also serves as *trustee for the estate.* In the usual case, that operating officer/trustee is the debtor itself, as "debtor-in-possession." 11 U.S.C. § 1101, 1107 . . .

There can be no "part" of a debtor that is not "in bankruptcy" during the pendency of a Chapter 11 proceeding . . .

All the earnings of an enterprise during bankruptcy, regardless of the source, must of necessity be "an interest in property" acquired by the estate after the commencement of the case, because the debt-

or's business is operated by the *debtor-in-possession, the trustee for the estate.* All post-petition earnings of the enterprise logically fall neatly into Section 541(a)(7) as "interest[s] in property acquired by the estate during the pendency of the bankruptcy." 11 U.S.C. § 541(a)(7).

This obvious conclusion causes no difficulty to anyone when the earnings of the enterprise in question are generated by a corporation in bankruptcy (e.g., Texaco), yet apparently offends the sensibilities of the courts when it is an individual in bankruptcy doing the earning. (emphasis added)

*Herberman* at 278–9.

This court agrees with Judge Clark's thoughtful, well-reasoned and well-articulated disposition of Dr. Herberman's case and of the issue which is now before this court.

## III.

*All of Dr. Harp's income is property of the bankruptcy estate, though the doctor may be compensated as an employee of the estate.*

Since the Eleventh Circuit Court of Appeals has not yet addressed this issue, there is no binding authority for this court to follow in deciding the Harp case. Therefore, this court will hold that all the postpetition income of Dr. and Mrs. Harp is property of the estate for the reasons discussed below.

Dr. Harp, unlike Dr. Herberman, owns only a one-fifth share of his medical practice and, as an individual, has no overhead or clinic employees to pay from his take-home from the professional corporation. Thus Dr. Harp's income (since he is the only member of the family who has reported income) and its use by the Harp family *is* the enterprise to be reorganized under Chapter 11.

A. **The dicta in the Supreme Court's** *Toibb* **case was sparked by the consideration of** *involuntary* **Chapter 11 debtors who might be forced into peonage by their creditors.**

1. **The Harps filed their petition voluntarily. Therefore, the dicta in** *Toibb* **should have no application to their case.**

Dr. and Mrs. Harp filed their Chapter 11 voluntarily, presumably because they were

unable to pay their bills as they came due and needed the relief provided by the automatic stay of Section 362. The original schedules I and J of the petition showed that at the filing of their bankruptcy petition, the Harp family was operating at a deficit of $10,336.05 a month—income, $17,251.00 and expenses (not even counting property taxes and insurance) of $27,587.05.

The Harps could just as easily elected for file a Chapter 7 liquidation proceeding. Again, the court must presume that they did not do so because, while they desired to stave off their creditors, they did not wish to liquidate their considerable assets down to the Alabama exemptions from execution which can be preserved from a Chapter 7 trustee.

*Toibb's* reference was dicta dismissing an argument that allowing individuals to be eligible for Chapter 11 reorganization where involuntary bankruptcies are allowed could theoretically result in the type of human bondage forbidden by the Thirteenth Amendment. Involuntary filings are not allowed in Chapter 13 because of the Thirteenth Amendment concern.

Section 1322(a)(1) says specifically that a Chapter 13 plan shall "provide for the submission of all or such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan; . . ."

In *Toibb,* the Supreme Court said:

Because there is no comparable provision in Chapter 11 requiring a debtor to pay future wages to a creditor, Congress' concern about imposing involuntary servitude (the congressional decision not to allow involuntary Chapter 13s) on a Chapter 13 debtor is not relevant to a Chapter 11 reorganization.

*Toibb,* 501 U.S. at 166, 111 S.Ct. at 2202, 115 L.Ed.2d at 154.

In making these comments, the high court was clearly referring to involuntary chapter 11s. The Harps filed a voluntary Chapter 11 and the dicta in *Toibb* is irrelevant to their situation.

As has already been pointed out, if the Harps wished retain all their postpetition income, they could have filed a Chapter 7 bankruptcy. But that would have cost them their considerable non-exempt prepetition assets.

## 2. An individual Chapter 11 case is a very different legal entity than an individual Chapter 13 case.

Additionally, it is not possible to analogize between most duties and rights of individuals in Chapter 13 and individuals in Chapter 11, particularly in a case with a history like that of the Harps. The following distinctions show this:

—There is always an outsider trustee for the creditors watching over the bankruptcy estate in a Chapter 13 case. *See* 11 U.S.C. § 1302. An effective trustee accepts the payments made under the debtor's Chapter 13 plan and routes the funds to plan creditors. He is also charged with more generally administering the plan, with making sure that *all* the debtor's disposable income is being paid out to creditors, with monitoring compliance by the debtor and with dismissing debtors who fail to pay from bankruptcy court protection.

In drastic contrast, the debtor-in-possession in a Chapter 11 *is* its/his/her own trustee. The court, in cases gone badly sour, may order appointment of a trustee in Chapter 11—but only after a party-in-interest makes a showing of "fraud, dishonesty, incompetence or gross mismanagement" by the debtor-in-possession. *See* 11 U.S.C. § 1104. It is highly unusual for a trustee to be appointed in Chapter 11 for this reason.

—In a Chapter 13 filing, the individual debtor is charged with filing his/her reorganization plan with the bankruptcy petition or within 15 days thereafter "and such time shall not be further extended except for cause shown and on notice as the court may direct." *See* Fed.R.Bankr.P. 3015(b).

Meanwhile in Chapter 11, the debtor has 120 days during which only the debtor-in-possession can file a reorganization plan. That time frame may be extended by the court. In the Harp case, the limit was extended twice and the debtor missed both extended deadlines. A plan was finally filed after the Bankruptcy Trustee's Office filed a

motion for a status conference where the Harps could explain why they had missed the second deadline.

After more than nine months in bankruptcy, the Harps now have a filed, but unconfirmed plan: a point reached within 15 days of the petition filing in Chapter 13.

—In a Chapter 13 case, "unless the court orders otherwise", the debtor must begin making payments to the trustee under his/her proposed plan within 30 days after the plan is filed. That is normally within about 45 days of the bankruptcy petition. *See* 11 U.S.C. § 1326(a)(1).

In Chapter 11, except for individually negotiated and ordered "adequate protection" payments to certain secured creditors, the debtor generally does not make any payments to creditors until the plan is confirmed. As the Harp case has shown, it can be nine months or even longer before plan payments begin.

So there is little real legal analogy between an individual debtor in Chapter 13 and an individual debtor-in-possession in Chapter 11.

The individual in Chapter 13 very much submits himself, his belongings and earning power to a trustee who is the fiduciary for the creditors. The Chapter 13 debtor gives up this freedom in return for the protection from his creditors offered by the code, in particular, by the automatic stay of 11 U.S.C. § 362.

In an individual Chapter 11, the individual seems to have much more freedom from these restraints while still enjoying the umbrella from debt collection and harassment of the Section 362 stay. But in actuality, the Chapter 11 debtor-in-possession has the much more difficult role of managing his own affairs for the benefit of his own creditors.

As Judge Clark pointed out in *Herberman,* self-restraint is required of the Chapter 11 debtor-in-possession so that these fiduciary duties to creditors can be fulfilled.

**B.  This court also agrees with Judge Clark's view that Section 541(a)(7) controls this issue rather than Section 541(a)(6).**

Section 541(a)(7) says simply that the bankruptcy estate includes "Any interest in property that the estate acquires *after the commencement of the case.*" (emphasis added) That seems clear enough.

On the other hand, Section 541(a)(6) says the estate includes "*Proceeds, produce, offspring, rents and or profits of or from property of the estate,* except such as are earnings from services performed by an individual debtor after commencement of the case." (emphasis added)

What Dr. Harp earns from Radiology Associates of North Alabama, P.C., as participant · in the practice are not "proceeds" of property of the bankruptcy estate. His earnings *are* property interests received "after commencement of the case" by the bankruptcy estate Dr. and Mrs. Harp have created. *See* 11 U.S.C. § 541(a)(7).

The radiology clinic is not in bankruptcy, thus its corporate property, tangible and intangible, is not property of the bankruptcy estate. What it pays to Dr. Harp is not "proceeds" of property of a bankruptcy estate. Therefore, Section 541(a)(6) does not exempt Dr. Harp's personal service income nor his income from any other source revealed in the record from the bankruptcy estate.

Indeed, Dr. and Mrs. Harp's earnings and expenditures together comprise the "enterprise" to be reorganized in Chapter 11. So clearly their postpetition, preconfirmation income is property of the bankruptcy estate under Section 541(a)(7).

This does not mean that the bankruptcy estate cannot pay Dr. Harp a reasonable wage in his role was as chief executive officer of the debtor-in-possession. But such request for an administrative expense should come through proper channels.

**C.  The Harps have failed to fulfill their fiduciary duties as trustee for unsecured creditors by depositing estate property in a non-DIP account, by refusing to account for property of the estate. and by refusing to provide information sought by the Bankruptcy Administrator, a party-in-interest and administrator for Chapter 11 cases.**

■  Dr. and Mrs. Harp pursued a risky path in attempting to break new legal ground

in this jurisdiction, no matter what case law from other courts might indicate.

Based on this court's interpretation of the law, they are clearly in breach of the statutory fiduciary duties of a Chapter 11 debtor-in-possession as set out by 11 U.S.C. §§ 1107(a), 1106 and 704.

Those breaches include, but may not be limited to, those already set out clearly in the record:

—Section 704(2) requires a debtor-in-possession "to be accountable for *all property received;*" (emphasis added) The Harps have declared themselves to be unaccountable for postpetition income, contending that some "property received" is their own and that they need not answer questions about its use.

—Section 704(7) directs a Chapter 11 debtor-in-possession to "furnish such information concerning the estate and the estate's administration as is requested by a *party in interest.*" (emphasis added) Additionally, Section 704(8) mandates that a Chapter 11 debtor shall "file with the court, the United States trustee (in Alabama and North Carolina, with the Bankruptcy Administrator's Office) ... periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and *such other information as the United States trustee (bankruptcy administrator) or the court requires;*". (emphasis added)

The facts of this case show that the Harps are plainly and intentionally in violation of these fiduciary duties, apparently in an attempt to test a legal theory rather than seeking court approval *before* they acted.

The Harps violated this court's operating order in their case by transferring property of the estate into a non-debtor-in-possession account, as well as breaching the fiduciary duty set out in Section 704(2).

They have also refused to answer to answer questions of the Bankruptcy Administrator's Office, a statutory duty of debtors-in-possession in their capacity as their own trustee under both Sections 704(7) and 704(8).

## CONCLUSION

Since the court has held that all Dr. Harp's income is property of the bankruptcy estate under Section 541(a)(7), the Harps are directed immediately to return all postpetition income to the debtor-in-possession accounts.

Additionally, the debtors-in-possession must provide the information sought by the Bankruptcy Administrator's Office under to fulfill statutory duties for Chapter 11 debtors-in-possession set out in Sections 704(7) and 704(8), and by the policies of the Bankruptcy Court for the Western Division, Northern District of Alabama.

The Harps must also file with the court updated Schedules I and J reflecting *all* of their income and expenditures as required by Fed.R.Bankr.P. 1007(b)(1), prepared as prescribed by Form 6 of the Official Forms.

The debtors-in-possession are directed in preparing these amendments to submit to the court a detailed budget of *reasonable* expenses for the Harp family, the bankrupt enterprise. This should include total income less reasonable expenses listed in detail (including all recurring payees) and a net disposable income to be made payable to creditors.

Based on this financial information, the court will determine a reasonable rate of compensation for Dr. Harp, as chief operating officer of the bankrupt enterprise. That salary will be paid as an administrative expense just as it would for the CEO of a bankrupt corporation.

The court will further consider the Harps' breach of fiduciary duties when full financial information on the first nine months of this case is made available. No further action may be necessary. But if it appears that problems exist, further proceedings may be held.

An order consistent with this memorandum of decision will be entered pursuant to Rule 7052.

**DONE AND ORDERED.**